Affiliated Enterprises, Inc. v. Commissioner.
Affiliated Enterprises v. Commissioner
Docket No. 106834.
United States Tax Court
1943 Tax Ct. Memo LEXIS 461; 1 T.C.M. (CCH) 551; T.C.M. (RIA) 43065; February 6, 1943
*461 Albert J. Gould, Esq., 1019 Midland Savings Bldg., Denver, Colo., for the petitioner. J. E. Marshall, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, J.: Petitioner in this proceeding challenges respondent's determination of a personal holding company surtax deficiency in the amount of $48,132.42 for the year 1937. The single question involved is whether at least 80 percent of petitioner's gross income was personal holding company income. Findings of Fact Petitioner was incorporated on November 16, 1933, under the laws of Colorado and its office is located in Denver, Colorado. Income and capital stock tax returns for 1937 were filed with the collector of internal revenue for the district of Colorado. Within one year after incorporation all outstanding stock except one share was in the hands of C. U. Yaeger, his wife, Clover Yaeger, Rick Ricketson, and his wife, Maizie Ricketson. There was no change in stock ownership in 1935, 1936, and 1937. Petitioner was organized to promote a plan called "Bank Night." Under the Bank Night system the public at large was permitted to register in the Register Book in the lobby of the theatre without purchasing tickets, *462 and each name was assigned a number. The names were transferred from the Register Book to the Record Book, where they were listed alphabetically and duplications eliminated. A sum of money was placed in a bank weekly by the theatre and drawn for on one night of each week. Those who registered were eligible, without purchasing a ticket, because the winning numbers were announced outside as well as inside the theatre, and the winner was permitted to enter the theatre to claim the prize without purchasing a ticket. Petitioner, during the years 1934, 1935, and 1936, arranged with theatre operators throughout the nation to use the system, for a fixed weekly fee, under a written agreement labeled "'Bank Night' License Agreement." The printed form of agreement recited that petitioner, referred to as "Affiliated," was the owner of the copyrighted and trade-marked name "Bank Night," and of certain copyrights and patents pending of certain cards, posters, registers, film trailers, record books, and other accessories used in staging Bank Night. The second party was called a licensee, and the agreement recited that the licensee desired to acquire a limited license to use Bank Night in its theatre. *463 The licensee acknowledged Affiliated's ownership of trademarks, copyrights, and patents pending, and also acknowledged that it paid only for the rights that Affiliated had in the things mentioned. Licensee further agreed to pay damages of $100 per day if it used Bank Night or any modification thereof after termination of the license agreement. Under the agreement petitioner retained the right, to be exercised at its option, to defend in the name of the licensee any court proceedings attacking the licensee's right to exercise the license or any phase thereof. Petitioner defended numerous lottery and other charges against theatre owners between 1934 and the end of 1937, and paid retainers or fees to approximately 30 attorneys or firms in both 1936 and 1937. On October 7, 1938, the respondent mailed a notice of personal holding company surtax deficiency for the years 1934, 1935, and 1936 to petitioner. Petition was filed with the Board of Tax Appeals and in such proceedings it was determined () that petitioner did not derive 80 percent of its income from royalties and that it was not a personal holding company. Respondent appealed from the Board's *464 decision and the Circuit Court of Appeals for the Tenth Circuit reversed the ), holding that more than 80 percent of petitioner's income was from royalties, as that term is used in the personal holding company provisions, and that petitioner was a personal holding company. The Supreme Court of the United States denied certiorari, . In December, 1936, the decision in , received special notice in several motion picture industry publications. That decision, also by the Tenth Circuit Court of Appeals, dismissed a bill by petitioner to enjoin an Oklahoma theatre owner from "using its plan * * * and for damages and profits realized from its use." In July of 1936, petitioner published a monthly bulletin giving information on matters affecting the system and instituted a service to theatre owners throughout the United States to give advice on theatre operations. This service was furnished free to persons operating under agreements with petitioner. Petitioner did not receive any income from this service in that year. *465 Petitioner in 1937 continued to fulfill existing written agreements with theatre operators by supplying the materials for the operation of Bank Night pursuant to the contract and continued to furnish legal services for the defense of Bank Night. No additional charge, however, was made for Bank Night supplies as had been made in 1934, 1935, and 1936. During 1937 petitioner maintained its 26 distributing agencies in cities throughout the United States and salesmen from these agencies interviewed and attempted to make contracts with theatre operators. Petitioner established no fixed weekly price but attempted to secure as large a weekly payment as possible from each operator. The form of the written contract used in the years 1934 through 1936 was not changed in 1937 to reflect any change in petitioner's business and many operators signed the written contract in 1937. Difficulty was encountered, however, in getting some theatre operators to sign contracts in 1937 because they did not know how long they would be permitted to operate the Bank Night system, and whether the services offered would prove valuable. Petitioner had prepared and furnished to its salesmen a pamphlet entitled "Manual, *466 Bank Night Theatre Service for 1937, A Department of Affiliated Enterprises, Incorporated," describing the services petitioner held itself out as prepared to furnish. These included the providing of information and advice on electrical costs, power costs, heating costs, accounting methods, advertising methods, architecture, purchasing discounts, decorating, financing, insurance, sound and projection equipment and operation, and the furnishing without additional cost of accounting forms for its recommended accounting system. Under the title "Business Stimulators" the pamphlet contained the following paragraph: The business stimulator, of recent origin, has become a development of importance in the theatre business and was formerly limited to the smaller houses where crudity of methods was experienced. It has gained in favor until it has come to find large de luxe theatres featuring BANK NIGHT, automobile drawings, etc. Petitioner made a large number of oral contracts with exhibitors unwilling to subscribe to the written contract. The amounts charged for the oral contracts ranged from $2.50 to $10 per week. Very few theatre operators were solicited in 1937 who had not been solicited *467 in the earlier years 1934, 1935, and 1936. Petitioner's salesmen were instructed as to petitioner's rights in the Bank Night system and were told that they could claim no such rights. In making contracts petitioner's salesmen exhibited to prospective customers the pamphlet referred to above and possibly the written contract form. The pamphlet described petitioner as "Owner of the trade-name, trade-mark, copyrights and/or patents pertaining to BANK NIGHT," and the reverse side of the written Bank Night license agreement contained the heading, "Bank Night Instructions," under which were the words "Copyrighted by Affiliated Enterprises, Inc., 1934." An attempt was made to get all operators to sign the written license agreement. The weekly payments by theatre operators were sent to one of petitioner's 26 distributing agencies and the agency transmitted the sums to petitioner's office at Denver. Gross income for the years 1934 through 1936 was respectively $116,982.17, $364,465.41, $770,558.31. Petitioner's gross income in 1937 was $832,212.34 of which $485,363.61, or 58.32 percent, was received from exhibitors who had signed written contracts, while $343,695.13, or 41.30 percent of that *468 sum, was received as a result of the oral contracts and the balance, $3,153.60, or.38 percent, was received from interest and rentals. Petitioner discontinued business in 1938 after the issuance of a fraud order against it by the Post Office Department of the United States on April 14, 1938. Opinion The background of this litigation lies in three Circuit Court of Appeals decisions. Petitioner, the promoter of a plan to stimulate motion picture theatre attendance called "Bank Night," made contracts with theatre proprietors authorizing the use of this plan. In one of the three cases, , reversing , such contracts were considered as in the nature of licenses and the payments which petitioner received therefor as in the nature of royalties within the meaning of Revenue Act of 1936, section 351, so that, the requisite percentage of petitioner's income having been derived from that source, it was a personal holding company under that provision. The other two cases, one of which came from the same circuit, held that petitioner could not *469 recover from defendants who were charged with violating petitioner's proprietary rights in the plan. ; . Although the liability in issue here is for a different year, respondent's first contention is that since the statute invoked and the parties are the same, the prior decision in , is res judicata. In any event, he insists, based upon the same principles as the earlier case, a like result must be reached here. While petitioner's taxability for 1936 as a personal holding company, decided in , may or not be res judicata with respect to the following year now before us, if that decision controls under the doctrine of stare decisis, the inquiry we must make here is the same. In either event, the question is whether the facts upon which the present issue arises are sufficiently similar to those for the *470 prior year so that the earlier decision must be followed. In , generally regarded as the progenitor and guide in tax cases involving res judicata, the parties stipulated before the trial judge evidence additional to and different from that shown in the predecessor action. The problem discussed throughout the progress of the case in all the forums (see , including the Supreme Court, was whether that further evidence raised a sufficiently different issue to prevent the earlier decision from controlling. It was ultimately determined that it did not. And while the doctrine of stare decisis normally applies where the parties to the subsequent litigation are different, there is no reason it should not be equally applicable where they are identical. See . It requires no resort to authority to demonstrate that the one question in invoking that doctrine is whether the two cases in question are essentially distinguishable, or whether facts and law involved are so similar *471 that the result formerly reached in one case is required in the other. We are hence unwilling to declare that the present situation is to be tested by a rule labeled res judicata on the one hand or stare decisis on the other. We approach the single issue in the only way it can be considered on either hypothesis and seek to determine whether the facts which petitioner has succeeded in educing here are sufficiently different in principle from those appearing in the earlier case to warrant a contrary result. Basically the difference urged can be reduced to two: first, that , and , decided at the close of 1936, put the world on notice that petitioner owned no exclusive rights in Bank Night for which anyone would pay a royalty or license fee; and, second, that petitioner changed its business methods and sold a service in 1937 rather than the rights of user of former years, and that the proportion of its 1937 income derived from that source was *472 sufficient to exceed the 20 percent prescribed in Revenue Act of 1937, Title I, amending Revenue Act of 1936, section 351. Petitioner has not succeeded in convincing us that the facts shown justify either conclusion. Neither the Gantz nor Gruber case held that petitioner had no property rights whatever in Bank Night. As to the former, the same court which decided it, later characterized the situation as follows ( ): The Board seems to have based its decision on the ground that Respondent [petitioner] had no property rights in its idea or system on which it could give licenses to others, because the system was not patentable * * * But the creative or novel idea would still have value and be subject to contract in the absence of a patent statute * * * And while we ordinarily think of royalty as payment for patentable or copyrighted articles, it is not necessarily required that the creative idea be subject to patent or copyright. And in the Gruber case, the Court said: At any rate, we think that the name "Parlay Cash Night" to designate the defendant's business through exhibitions or drawings *473 will have no tendency to confuse the public or plaintiff's [petitioner's] possible customers or licensees * * * the plaintiff * * * can come into equity for an injunction against unfair competition, prohibiting another from representing the exhibitions promoted by him are exhibitions promoted by it and preventing the unwarranted use of its property to aid him in competing with it. It is not alleged that the defendants have done any of these things. And that the theatre operators as a class did not entirely disparage petitioner's proprietary rights even in 1937 is shown by the preponderance of petitioner's income for that year from the written-contract source, it being conceded that these were identically worded with those of prior years, and from the following excerpt from testimony given on petitioner's behalf: Q. Well, if they believed you had rights they would have signed a written contract, would they not? A. They certainly would have signed written contracts. If, as petitioner contends, no one could still believe petitioner had rights worth licensing, it seems impossible to account for the large percentage of written contracts which even petitioner does not seriously deny *474 were license agreements. Nor are we more greatly moved by the second claim, that the income from the oral agreements, in excess of 20 percent of total income, was entirely for services. It should be made clear, at the outset, that petitioner's position in this regard cannot be maintained merely by showing that some amount was paid for the socalled services, consisting of advice and information on various phases of theatre operation. Petitioner relies entirely on these oral contracts, which constituted 41 percent of total income. It inferentially admits that the remaining 59 percent was royalty income. Thus, if as much as 21 percent, roughly half of the oral contract income, was paid under the oral contracts for rights to use Bank Night, under circumstances similar to 1936, and to the written contracts of 1937, the requisite 80 percent of royalty income would be present here and it would be of no consequence that the remaining income was payment for services. And, of course, it would not matter that petitioner had limited rights, or even none at all. The question is not what petitioner had to give, so much as what the parties thought they were dealing with and what the licensee was *475 paying for. Furthermore, it is apparent from the record that Respondent in its dealings with theatre operators treated the transaction as one involving the payment of royalty for the use of a creative, novel idea possessing utility. During all the years involved, it had pending applications for a patent and copyright. The trade name was registered in the states in which it operated. The contract was headed: "Bank Night License Agreement." It recited that Respondent was the owner of the copyrighted and trade mark name, "Bank Night," and of certain copyrights and patents pending. It specifically stated that the intent of the agreement was to grant the licensee the right to use the copyright and trade mark name, "Bank Night," and all copyrighted articles. The parties at the time certainly thought they were dealing with reference to an idea subject to protection by patent or copyright, and that the transaction involved royalty payments. * * * [ ]. Presumably, in recognition of this burden upon it, petitioner sought to show that representations were made to prospective customers that it had no special *476 rights in Bank Night. The inference, we assume, is that if this were made clear, no amount could possibly have been paid as a royalty for the use of the system or name. But aside from this, petitioner made no effort to apportion the source of the proceeds from the oral contracts, and it follows that unless we are satisfied that none of the oral contract receipts could reasonably have been attributable to the license aspect, the petitioner has failed to meet the burden of showing that less than 80 percent of its income was from sources comparable to royalties. We discard such a conclusion for a multitude of reasons, among which are the following: 1. The evidence does not show that prospective customers were advised that petitioner claimed no rights in Bank Night. All that was stated was that the salesmen were so instructed. The same witness testified: Q. And you talked to the salesmen? A. Yes, sir. Q. Do you think they could have been attempting to sell Bank Night rights without your knowledge? A. Naturally they could have, but I don't think they did. 2. The uncontradicted documentary evidence shows that at this time petitioner still maintained its claims to the ownership of *477 copyrights, trade-marks, and similar exclusive proprietorship and some, at least, of these statements were of a nature to have come logically to the attention of prospective customers. 3. During this very year, and even following one, petitioner was still attempting to patent its plan. The Board's findings in the prior case recite: Petitioner made application for patent in 1937 and 1938, which was rejected in the same years on the holding that "the art cited is unpatentable." [Affiliated Enterprises, Inc., supra, 393]. 4. One examines the record in vain for any direct statement as to just what was - and what was not - undertaken by the "oral contract." It is thus impossible to say it offered no license to use "Bank Night." 5. Nor does the unwillingness of some subscribers to sign written contracts evidence their lack of interest in the license aspect. One of the reasons petitioner's own witness gives for that reluctance is that "hundreds of exhibitors that were using Bank Night * * * were very much disturbed as to the future of this plan" * * * others * * * didn't know how long they might be able to use Bank Night * * *," presumably because of legal attacks upon it as a lottery. *478 It is not difficult to understand their unwillingness to enter into the formal commitments of an annual written contract, or that "they wouldn't sign contracts, and reserved the right to discontinue it at any time." 6. Certain supplies for Bank Night were apparently to be furnished by petitioner. Petitioner's president testified: Q. Now, as a result of those contracts that were made orally, the company sent out supplies to the different theatre owners, is that right? A. Yes, sir. We sent supplies whether they were made orally or by contract. These, at least, may have been copyrighted and exclusively permitted to petitioner and its licensees, for the written contract refers to petitioner's ownership of copyrights and patents pending on certain cards, registers, record books, and other accessories to be "used in staging * * * Bank Night," and, as we have seen, the Affiliated Enterprises case for 1936 refers to the grant to the licensee of the right to use the "name 'Bank Night' and all copyright articles." 7. The facts show that as early as the middle of 1936 petitioner had instituted the practice of furnishing services to its subscribers. Furthermore, the 1937 pamphlet implies *479 that the services there described were available under the written licenses as well as to the participants in the oral contracts. Consequently the record falls far short of showing that petitioner's practice in 1937 was radically different from 1936, when it was concededly a personal holding company, or that the customers paying under oral contracts, in 1937, contributed income to petitioner which was radically different from what it received under the written contracts which petitioner inferently concedes was royalty income. 8. When Bank Night became finally unworkable in the following spring, due to a Post Office Department order, petitioner closed up shop notwithstanding its other "services." If a sizable amount of its income was attributable to the latter source, it seems difficult to account for the voluntary termination of a lucrative business. On all the evidence, we are unable to say that petitioner has demonstrated any essential difference in its situation during 1937 from 1936, and we are hence of the opinion that more than 80 percent of its income was received from royalties or comparable sources during 1937 as well as 1936, and that it was a personal holding company *480 during the instant year under Revenue Act of 1937, Title I. Decision will be entered for respondent.